UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
MARYANN ASTUTO,
                 Plaintiff,

                    **MEMORANDUM & ORDER**

       -against-                      16-CV-1870 (PKC)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                 Defendant.
----------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Plaintiff Maryann Astuto ("Plaintiff") brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration's ("SSA") denial of her claim for Disability Insurance Benefits ("DIB"). The parties have cross-moved for judgment on the pleadings. (Dkts. 11, 12.) Plaintiff seeks reversal of the Commissioner's decision and an immediate award of benefits, or alternatively, remand for further administrative proceedings. The Commissioner seeks affirmation of the denial of Plaintiff's claims. For the reasons set forth below, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's motion. The case is remanded for further proceedings consistent with this Order.

## BACKGROUND

### I. PROCEDURAL HISTORY

On August 16, 2006, Plaintiff filed an application for DIB, claiming that she has been disabled since December 2, 1998, due to traumatic arthritis of the right ankle. (Tr. 30-32.) After her claim was initially denied, Plaintiff appeared for a hearing before an administrative law judge ("ALJ") on July 22, 2008. (Tr. 30.) By decision dated September 23, 2008, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act at any time since December 2, 1998. (Tr. 34-35.) After the SSA denied Plaintiff's application for review, Plaintiff

filed an action in this Court seeking reversal or remand of the ALJ's September 23, 2008 decision. *Astuto v. Comm'r of Soc. Sec.*, No. 10 Civ. 5842 (E.D.N.Y. filed Dec. 16, 2010). By stipulated order dated May 2, 2011, this Court reversed and remanded the action for further administrative proceedings, including "a new hearing; further development of the record; evaluation of treating source opinion evidence, particularly that of John P. Reilly, M.D.; an orthopedic consultative examination, if necessary; supplemental orthopedic medical expert and vocational expert evidence, if warranted; and a new decision." Stipulation and Order, *Astuto*, No. 10 Civ. 5842, ECF No. 7.

After remand by this Court, Plaintiff appeared for another administrative hearing before a different ALJ. (Tr. 39.) By decision dated April 19, 2012, the ALJ determined that Plaintiff was not disabled at any time between the alleged onset date, December 2, 1998, and Plaintiff's date last insured, December 31, 1999. (Tr. 42-48.) On appeal from that decision, the SSA Appeals Council remanded the case for a new ALJ hearing and decision because "[t]he official claims folder, along with the hearing recording, [could ]not be located." (Tr. 51.)

Plaintiff appeared for a third administrative hearing on September 25, 2014, before the same ALJ that had issued the unfavorable decision dated April 19, 2012. (Tr. 18-25.) By decision dated October 23, 2014, the ALJ determined that Plaintiff was not disabled between December 2, 1998, and the date last insured, December 31, 1999. (Tr. 18-25.) The ALJ's October 23, 2014 decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on February 19, 2016. (Tr. 5.) Plaintiff commenced this action on April 18, 2016, seeking judicial review of the ALJ's October 23, 2014 decision. (Dkt. 1.)

2

## II. STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Social Security Act (the "Act") may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and internal quotation marks omitted)). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (quotation omitted). However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013).

## III. ELIGIBILITY STANDARD FOR SOCIAL SECURITY DISABILITY BENEFITS

To receive DIB, claimants must be disabled within the meaning of the Act. Claimants establish disability status by demonstrating an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). The claimant bears the

initial burden of proof on disability status and must demonstrate disability status by presenting medical signs and findings, established by "medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(D). However, the ALJ has an affirmative obligation to develop the administrative record. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009). This means that the ALJ must seek additional evidence or clarification when the claimant's medical reports contain conflicts or ambiguities, if the reports do not contain all necessary information, or if the reports lack medically acceptable clinic and laboratory diagnostic techniques. *Demera v. Astrue*, No. 12 Civ. 432, 2013 WL 391006, at *3 (E.D.N.Y. Jan. 24, 2013); *Mantovani v. Astrue*, No. 09 Civ. 3957, 2011 WL 1304148, at *3 (E.D.N.Y. March 31, 2011).

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant bears the burden of proof in the first four steps in the inquiry; the Commissioner bears the burden in the final step. *Talavera*, 697 F.3d at 151. First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the claimant is not disabled. If the claimant is not engaged in "substantial gainful activity," the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is determined to be severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the claimant is not disabled within the meaning of the Act. However, if the impairment is severe, the ALJ proceeds to the third step, which considers whether the impairment meets or equals one of the impairments listed in the Act's regulations (the "Listings"). 20 CFR § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

If the ALJ determines at step three that the claimant has one of the listed impairments, then the ALJ will find that the claimant is disabled under the Act. On the other hand, if the claimant does not have a listed impairment, the ALJ must determine the claimant's "residual functional capacity" ("RFC") before continuing with steps four and five. The claimant's RFC is an assessment which considers the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in the work setting." 20 C.F.R. § 404.1545(a)(1). The ALJ will then use the RFC determination in step four to determine if the claimant can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the answer is yes, the claimant is not disabled. Otherwise the ALJ will proceed to step five where the Commissioner then must determine whether the claimant, given the claimant's RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the answer is yes, the claimant is not disabled; otherwise the claimant is disabled and is entitled to benefits. *Id.*

## IV. RELEVANT FACTS AND MEDICAL RECORDS

Plaintiff's claim of disability stems from an ankle fracture that Plaintiff sustained in January 1994, for which she underwent surgery on January 26, 1994. (Tr. 193-260, 227-28.) The surgery was performed by Dr. Stephen Pollack, an orthopedist, and involved, among other things, the installation of a metal plate on Plaintiff's right fibula. (Tr. 227-28.) Plaintiff followed up with Dr. Pollack for post-operative treatment in February, March, and August of 1994, and Dr. Pollack reported that, as of August 29, 1994, Plaintiff's fracture was "well healed," although she had "los[t] a few degrees of dorsiflexion of the ankle." (Tr. 74-75.)

On November 13, 1995, Plaintiff was examined by Dr. Peter A. Godsick, a licensed physician, in connection with an insurance claim proceeding. (Tr. 261-62.) Dr. Godsick reported

that Plaintiff "wore no orthotic devices [and] used no external aids for ambulation," although she had some "thickening" and decreased range of motion in her right ankle. (Tr. 261-62.)

Plaintiff visited Dr. Pollack again on July 21, 1997. (Tr. 274-75.) Dr. Pollack reported that Plaintiff had "some complaints of mild pain in her ankle," that "[e]xamination revealed the incisions [in her ankle] to be well healed," and that "the fracture [was] well healed," but Dr. Pollack also noted that Plaintiff "has lost approximately 5 [degrees] of dorsiflexion" and that "X-rays demonstrated . . . evidence of traumatic arthritis." (Tr. 274-75.)

Before her surgery in January 1994, Plaintiff had worked as a Dental Assistant for several years. (Tr. 147.) After the surgery, however, starting in or around January 1998, Plaintiff began a job as a receptionist for a financial firm. (Tr. 147.) According to Plaintiff, she took the receptionist job because it was "a job sitting down," which she "figure[d] [she] would be able to do" even though her ankle had "[p]rogressively gotten worse" since the surgery. (Tr. 355.) But, Plaintiff explained to the ALJ, the receptionist job did not work for her:

> I couldn't do it. I couldn't sit. . . . I was calling out sick too much and I couldn't elevate my leg. My leg was swelling up and the commute, sitting for too many hours was just too much for me. . . . And in time, it's progressively gotten worse. I can't sit for a long period of time. I can't stand. I can't walk long. It's really taken a toll on me.

(Tr. 355.) Plaintiff stopped working as a receptionist on or around December 2, 1998, and she has not engaged in gainful employment since that date. (Tr. 147.)

As noted above, Plaintiff visited Dr. Pollack on July 21, 1997, about six months before she began working as a receptionist, and about eighteen months before her alleged onset date of December 2, 1998. The administrative record is unclear, however, as to what treatment, if any, Plaintiff received for her ankle after her visit to Dr. Pollack on July 21, 1997. Plaintiff asserts that she continued to seek treatment for her ankle from Dr. Pollack from July 21, 1997 through

6

sometime in 2006 or 2007. (Tr. 174, 324.) But the administrative record does not contain any documentation of such visits—indeed, the record does not contain any medical records for the period of July 21, 1997 through May 2006. (Tr. 18-25.) According to Plaintiff, Dr. Pollack's records "were all destroyed," and, "[i]n fact, [Plaintiff] wa[s] only able to obtain the 1997 [and earlier] record[s] . . . from [Plaintiff's] personal injury attorney who handled a third-party lawsuit resulting [from] the original injury." (Tr. 324; *see also* Tr. 330-31.)[1]

The gap in Plaintiff's medical history ends on May 6, 2006, when Plaintiff visited Dr. John R. Reilly of the Orthopaedic Associates of New York. (Tr. 291.) Dr. Reilly's notes from the May 6, 2006 evaluation indicate that Plaintiff "has been having pain in [her ankle] now fairly constantly since she had a fracture and was fixed surgically with plate and screws by Dr. Pollack in 1993," and that "[r]ight now [Plaintiff] is just relying on Advil." (Tr. 291.) Dr. Reilly noted that Plaintiff "ambulates independently with a limp to the right[,] has "mild restriction in flexion and extension" in her right ankle, and "[n]o swelling" in her ankle. (Tr. 291.) Dr. Reilly's overall impression was "[t]raumatic arthritis, right ankle, status post fracture and ORIF."[2] (Tr. 291.) Dr. Reilly recommended the following treatment:

> [C]ontinue conservative care with Motrin 800, a sleeve for some support, weight control and some heat. Dr. Pollack had [alluded] in the past that he did not feel that hardware removal would eliminate all her pain but clearly it has the potential for some relief particularly over the lateral incision which is superficial. I did point out to [Plaintiff] that the potential does exist . . . that the traumatic arthritic symptoms

---

[1] The only document in the record that appears to have been generated by the medical practice where Plaintiff was treated by Dr. Pollack is a letter, dated July 29, 1997, from Dr. Pollack to a private law firm. (Tr. 274-75 (bearing the letterhead of "Staten Island Orthopaedic Associates, P.C.").)

[2] "ORIF" refers to "open reduction internal fixation," which is a surgical procedure that consists of "reduction by manipulation of bone, after surgical exposure of the site of the fracture," and the "stabilization of fractured bony parts by direct fixation to one another with surgical wires, screws, pins, rods, or plates." Stedmans Medical Dictionary 33700, 633240, 766290.

would persist. Options down the road also might be to consider cortisone injection or more rigid brace. Ultimately, if [t]he symptoms were to deteriorate her level of function and quality of life, arthrodesis[3] would as well may need to be considered.

(Tr. 291.)

In connection with Plaintiff's initial application for DIB, Dr. Reilly completed an RFC assessment dated October 2, 2006. (Tr. 263-70.) Dr. Reilly opined in the assessment that Plaintiff can occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and/or walk with normal breaks for less than two hours in an eight-hour workday, and sit with normal breaks for less than about six hours in an eight-hour workday. (Tr. 264.) Dr. Reilly also opined that Plaintiff can never engage in climbing, balancing, stooping, kneeling, crouching, or crawling due to her "severe traumatic arthritis [in her] right ankle." (Tr. 265.) Dr. Reilly also opined that Plaintiff did not have any visual limitations and did not have any limitations in reaching, handling, fingering, or feeling. (Tr. 266.)

Plaintiff continued to visit Dr. Reilly from May 2006 through July 2014, at first in one- or two-month intervals, and later in six-month or longer intervals. (Tr. 291-314.) Dr. Reilly's notes from that time period are consistent in diagnosing Plaintiff with "traumatic arthritis," observing restricted motion and antalgic gait,[4] and opining that Plaintiff is currently "disabled and unable to work." (Tr. 291-314.) Throughout this time, Plaintiff continued to regularly take 800mg ibuprofen for pain, and Dr. Reilly did not recommend any other treatment, other than noting in June 2008 that Plaintiff "may likely require an ankle arthrodesis (fusion) in the future." (Tr. 301.)[5]

---

[3] Arthrodesis is "the stiffening of a joint by operative means." Stedmans Medical Dictionary 75830.

[4] Antalgic gait is "a characteristic gait resulting from pain on weight-bearing in which the stance phase of gait is shortened on the affected side." Stedmans Medical Dictionary 359070.

[5] On October 19, 2008, Dr. Reilly opined that it was his "medical opinion, with a reasonable degree of certainty, that any procedure to remove [Plaintiff's] [metal plate] will not with any

In addition to Dr. Reilly's treatment notes, the record also contains several letters from Dr. Reilly to Plaintiff's attorneys concerning Plaintiff's medical limitations (Tr. 301-02, 311, 325-26), two of which bear mention here. By letter dated May 14, 2012, Dr. Reilly opined as follows:

> Based on the history available and her examination in 2006 with symptomatology, range of motion restrictions and x-ray evidence of traumatic arthritis, it remains my opinion that her condition was disabling prior to December 31, 1999[,] and in fact believe that she was functionally limited subsequent to the fracture fixation to and through the current time frame today with no intervals during which she was not disabled.

(Tr. 311.) By letter dated January 19, 2015, Dr. Reilly opined as follows:

> [During Plaintiff's first visit on May 6, 2006,] I was able to and did review numerous medical records including the operative report from Dr. Pollack for her ankle surgery in 1994, IME reports and various office records through the period of time that Dr. Stephen Pollack cared for her. I concluded that the type of injury and surgery performed along with the natural history of this injury leads to the traumatic arthritis developing. The nature of her post-operative management indeed would be minimal, basically just oral anti-inflammatories and bracing since physical therapy at that time would not be indicated and certainly, until the patient wished an alternative surgery (ankle arthrodesis), there was no other more minimal surgical interventions to consider. . . . [I]f and when the symptoms in her view deteriorate adequately an ankle arthrodesis would be an appropriate Orthopaedic treatment. Accordingly, it remains my opinion that to a reasonable degree of medical certainty that Ms. Astuto reached Listed Impairment 1.02A before December 31, 1999.
>
> If there is anything further, please do not hesitate to contact me.

(Tr. 325-26.)

The administrative record does not contain any subpoenas for medical records. The record also does not contain any interrogatories or other correspondence from the ALJ to Dr. Reilly to

---

significant expectation relieve her symptoms since they are not related to the hardware present in the ankle but to the traumatic arthritis . . . ." (Tr. 302.)

follow up on Dr. Reilly's medical notes and opinions or to seek additional information from him. The record also does not contain any other evidence that the ALJ took steps to obtain information from Dr. Reilly or any other medical expert in adjudicating Plaintiff's claims after this Court remanded the case for further proceedings in May 2011.

## V. THE ALJ'S DECISION

The ALJ's October 23, 2014 decision followed the five-step evaluation process established by the SSA to determine whether an individual is disabled. (Tr. 18-25.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between her alleged onset date (December 2, 1998) through her date last insured (December 31, 1999). (Tr. 21.) At step two, the ALJ determined that Plaintiff suffered from traumatic arthritis of her right ankle, which qualified as a severe impairment. (Tr. 21.)

At step three, the ALJ determined that Plaintiff's impairment did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21.) In reaching this determination, the ALJ considered Listings 1.02 ("Major dysfunction of joint(s)") and 1.03 ("[I]nability to ambulate effectively"), and specifically found that Plaintiff's impairment did not meet either of those listings because "there is no evidence that the claimant had major dysfunction of the right ankle joint during the relevant time period, nor had she lost the ability to ambulate effectively." (Tr. 21.) As support for this determination, the ALJ noted that "[a]n examination conducted by All-State Insurance Company in 1995 revealed that the claimant did not use any assistive devices or aids for ambulation," that "an examination with Dr. [Stephen] Pollack in July 1997 noted a loss of approximately 5 degrees of dorsiflexion, but did not note any use of an assistive device or ambulation deficits," and that "[t]he record then shows a gap in

10

treatment until May 2006 when the claimant began treatment with Dr. Reilly, who noted in his initial examination of the claimant that she ambulated with a limp, but independently." (Tr. 21.)

Having determined that Plaintiff's impairment did not meet or medically equal any of the impairments in the Listings, the ALJ determined Plaintiff's RFC, finding that Plaintiff was able to perform sedentary work with certain exceptions. (Tr. 21.) Specifically, the ALJ articulated the following RFC:

> [T]he undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she must be given the option to alternate between sitting and standing every 30 minutes. Additionally, she can occasionally climb ramps and stairs, but can never climb ladders, ropes or scaffolds. She can occasionally balance, stoop, kneel, and crouch, but never crawl. She can perform jobs that do not involve exposure to temperature extremes or hazards such as unprotected heights or dangerous machinery. She can perform jobs that do not involve the operation of foot controls or foot pedals [and] that allow her to elevate the right lower extremity while in a seated position to below the knee level and around the ankle level.

(Tr. 21-22.)

The ALJ acknowledged that his determination of Plaintiff's RFC did not accord with Plaintiff's own description of the intensity, persistence, and limiting effects of her traumatic arthritis. (Tr. 21.) The ALJ explained that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms during the relevant time period are not entirely credible." (Tr. 22.) The ALJ gave the following reasons for discounting Plaintiff's description of the disabling effects of her traumatic arthritis. First, the ALJ found that "the medical records show no treatment whatsoever during [the] approximately one-year period" of December 2, 1998 through December 31, 1999. (Tr. 22.) Second, the ALJ noted that Dr. Pollack's post-operative notes indicated that Plaintiff had healed well from the operation and had only "mild" pain as of July 1997. (Tr. 22.) Third, the ALJ emphasized again that "[a]fter the [July] 1997 examination

11

with Dr. Pollack, the record shows no further treatment until May 2006, when the claimant began treatment with Dr. John Reilly." (Tr. 23.) Fourth, the ALJ observed that when Plaintiff visited Dr. Reilly in 2006, Dr. Reilly noted that Plaintiff ambulated independently, and recommended "conservative management including Motrin, a sleeve for some support, weight control, and heat." (Tr. 23.)

In the course of determining Plaintiff's RFC, the ALJ also criticized and gave "little weight" to the medical opinions of Dr. Reilly. (Tr. 24.) The ALJ discounted Dr. Reilly's opinions for largely the same reasons he discounted Plaintiff's own statements of the limiting effects of her impairment. First, the ALJ afforded less weight to Dr. Reilly's opinions because they were based in part on Plaintiff's own description of her symptomology, which the ALJ had already discounted for the reasons stated above. (Tr. 24.) The ALJ then reiterated those very same reasons, emphasizing that Dr. Reilly's opinion is "entirely inconsistent with the total lack of any treatment whatsoever from July 1997 until May 2006," and that, "if Dr. Reilly truly believes the claimant's condition is as painful and debilitating as alleged, it raises the question why he has treated her so minimally—essentially doing nothing other than prescribing a sleeve and Ibuprofen." (Tr. 24.) Finally, the ALJ opined that "it defies common sense that Dr. Reilly could tell with a reasonable degree of certainty—based upon an examination from 2006—that the claimant had been totally disabled since December 1999, almost 9 years before he ever met her." (Tr. 24.)

After determining Plaintiff's RFC, the ALJ asked a vocational expert to opine on whether someone with Plaintiff's limitations would be able to perform her past relevant work as a receptionist. (Tr. 24.) Based on the vocational expert's testimony, the ALJ concluded that Plaintiff was capable of performing past relevant work as a receptionist. (Tr. 24-25.) On that basis, the

ALJ concluded that Plaintiff was not disabled from the alleged onset date (December 2, 1998) through her date last insured (December 31, 1999). (Tr. 25.)

## DISCUSSION

Plaintiff challenges the ALJ's denial of benefits on two grounds. First, Plaintiff argues that the ALJ erred in determining, at step three of his analysis, that Plaintiff's impairment did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Pl.'s Br., Dkt. 11, at ECF[6] 7-12.) Second, Plaintiff argues that the ALJ erred by failing to afford proper weight to Dr. Reilly's retrospective medical opinion that Plaintiff was completely disabled during the relevant period. (*Id.*) In addition, as part of its "plenary review of the record," *Pratts v. Chater* 94 F.3d 34, 37 (2d Cir. 1996), the Court has considered, *inter alia*, whether the ALJ erred in discounting Plaintiff's statements concerning the intensity and limitations of her symptoms on the ground that they were "not entirely credible." (Tr. 23-24.) For the reasons stated below, the Court finds that the ALJ erred in discounting Plaintiff's statements concerning the intensity and limitations of her symptoms without further developing the record. Furthermore, the Court finds that the ALJ's errors in this regard are grounds for remand to further develop the record and issue a new decision, as explained more fully herein.[7]

As summarized above, the ALJ's determination that Plaintiff was not disabled during the relevant period was predicated on his finding that Plaintiff's statements concerning the pain and

---

[6] "ECF" refers to the pagination generated by the Court's CM/ECF system, and not the document's internal pagination.

[7] Because the Court reverses and remands on this ground, the Court need not address the ALJ's decision to afford "little weight" to Dr. Reilly's medical opinion or the ALJ's determination that Plaintiff's limitation did not meet or medically equal any of the impairments in the Listings. On remand, the ALJ should reconsider those determinations *de novo* in light of the holdings made in this Order.

limitations caused by her ankle were "not entirely credible." (Tr. 22-23.)[8] The ALJ discounted Plaintiff's statements on the purported grounds that (i) Plaintiff sought "no treatment whatsoever during [the] approximately one-year period of December 2, 1998 through December 31, 1999"; (ii) Dr. Pollack's post-operative notes indicated that Plaintiff had only "mild" pain as of July 1997; (iii) "[a]fter the 1997 examination with Dr. Pollack, the record shows no further treatment until May 2006, when the claimant began treatment with Dr. John Reilly"; and (iv) Plaintiff's treatment has consisted of "conservative management including Motrin, a sleeve for some support, weight control, and heat." *See supra*.

The Court finds no error in the ALJ's consideration of Dr. Pollack's July 1997 treatment notes, which reported that Plaintiff was in "mild pain," as part of his overall evaluation of Plaintiff's pain statements. *See* S.S.R. 16-3P, 2016 WL 1119029, at *6 (Mar. 16, 2016) (in evaluating claimant's statements concerning intensity and limitations, ALJ may consider "statements about symptoms [made] directly to medical sources"). Similarly, the Court acknowledges that the ALJ was permitted to consider Plaintiff's treatment regime, *i.e.*, ibuprofen and a sleeve, as one factor in evaluating her pain statements. *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).

However, the Court finds that the ALJ committed error in discounting Plaintiff's pain statements based on his finding of "no treatment whatsoever" from July 1997 through May 2006. Although there is a gap in Plaintiff's medical records for the time period of July 1997 through May 2006, there is no affirmative evidence in the record—whether in the form of direct testimony or a

---

[8] Although the ALJ's decision does not explicitly say so, the context makes clear that the "statements" to which the ALJ was referring were Plaintiff's statements that the pain she experienced in her ankle as a result of swelling, commuting, and sitting for too many hours "was just to much for [her]." *See supra* (citing Tr. 355).

14

factual finding based on circumstantial evidence—that Plaintiff received "no treatment whatsoever" during this timeframe. Indeed, Plaintiff notified the ALJ that she had continued to receive treatment from Dr. Pollack during that timeframe, but that the corresponding medical records had been destroyed. (Tr. 330-31.) Given this assertion by Plaintiff, the ALJ was not free to conclude, as he did, that Plaintiff had sought "no treatment whatsoever" during this timeframe. (Tr. 22.) Rather, as part of his duty to develop the record, the ALJ should have sought additional records—either from Plaintiff, Plaintiff's attorney, or Dr. Pollack's offices—to determine whether Plaintiff had in fact seen Dr. Pollack during the relevant timeframe and, if so, what records of that treatment were available. *See Burgess*, 537 F.3d at 131 (holding that, where "the ALJ should have been aware of [the] existence" of a relevant record that had not been included in the administrative record, "the ALJ, given his duty to develop the record, should have requested the [record] be supplied, rather than simply stating in his decision that 'there was no [such record]'").[9]

Furthermore, the Court finds that the ALJ's failure to adequately develop the record as to Plaintiff's visits to Dr. Pollack from July 1997 through May 2006 is grounds for remand. As noted above, the ALJ gave two reasons to discount Plaintiff's pain statements other than Plaintiff's supposed gap in treatment—namely, Dr. Pollack's report that Plaintiff had "mild pain" in July 1997, and the ostensibly "conservative treatment regime" that Plaintiff has undertaken for her pain. As to the first reason, the Court finds that Dr. Pollack's note of "mild pain" in July 1997 does not contradict Plaintiff's testimony that her pain intensified gradually the next year, culminating in the need for Plaintiff to stop working due to the pain in December 1998. *See supra* (citing Tr. 355).

---

[9] Indeed, the ALJ's error here was particularly troubling—not only did he fail to take reasonable steps to remedy a known gap in Plaintiff's medical record, but he took the additional step of drawing an adverse inference against Plaintiff, stating repeatedly that Plaintiff sought "no treatment whatsoever" during the period of alleged disability. (Tr. 22-24.)

15

As to the second reason, the Court finds that the ALJ erred in characterizing Plaintiff's treatment regime as "conservative" without further developing the record and, if necessary, obtaining a medical expert's opinion as to what other treatment would have been given or prescribed to Plaintiff if her pain levels were higher. Although the ALJ described Plaintiff's treatment as "minimal[]—essentially . . . nothing other than . . . a sleeve and Ibuprofen"—the ALJ did not identify any other treatments that would have relieved Plaintiff's pain, nor did he send interrogatories to Dr. Reilly to obtain an explanation for Plaintiff's conservative treatment regime. The ALJ also did not retain a medical consultant qualified to opine on alternative treatments that someone with Plaintiff's physical impairment would normally have undertaken if they experienced the pain levels that Plaintiff was claiming. (Tr. 18-25, 327-46.) Instead, the ALJ appears to have relied on his own experience in concluding that a treatment regime consisting of "a sleeve and Ibuprofen" was not consistent with Plaintiff's claimed levels of pain. This approach not only violates the basic rule that "[t]he ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion," *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015), but it also ignores the record evidence that Plaintiff is allergic to at least one common form of prescription pain reliever (*see, e.g.*, Tr. 224 (noting that Plaintiff is allergic to Codeine)). *See also Burgess*, 537 F.3d at 130 (holding that an ALJ cannot discount pain statements based on a "conservative" treatment plan or the absence of "stronger pain medication" absent an "overwhelmingly compelling type of critique that would permit the [ALJ] to overcome an otherwise valid medical opinion"). Moreover, even if the ALJ were competent to determine Plaintiff's treatment regime as "conservative," that determination alone would not be sufficient to discount Plaintiff's pain statements. *See Burgess*, 537 F.3d at 129 ("The fact that a patient takes only over-the-counter medicine to alleviate her pain may . . . help to support the Commissioner's

conclusion that the claimant is not disabled [only] if that fact is accompanied by other substantial evidence in the record, such as the opinions of other examining physicians and a negative MRI.").

In the final analysis, the Court finds that the ALJ erred in finding Plaintiff's pain statements "not entirely credible" without further developing the record. At a minimum, the ALJ should have made reasonable efforts to determine whether Plaintiff had, in fact, as she claimed, visited Dr. Pollack between July 1996 and May 2006, and, if so, the ALJ should have obtained any relevant records of that treatment. In addition, before characterizing Plaintiff's treatment regime as "conservative" and discounting her pain statements on that basis, the ALJ should at least have requested that Dr. Reilly explain why, in the nearly twenty years since Plaintiff's alleged onset date, Plaintiff had not received other modes of treatment or stronger pain medication. Once Dr. Reilly responded to that request, the ALJ should have evaluated Dr. Reilly's response as he would any other medical opinion, including retaining, as necessary, an independent expert to evaluate Dr. Reilly's response.[10] Accordingly, this action is remanded for further development of the record and further proceedings consistent with this Order. *See Kercado v. Astrue*, No. 08 Civ. 478, 2008 WL 5093381, at *1 (S.D.N.Y. Dec. 3, 2008) ("It is well settled that the ALJ has an affirmative duty to develop the record in a disability benefits case and that remand is appropriate where this duty is not discharged."); *accord Lamorey v. Barnhart*, 158 F. App'x 361, 362 (2d Cir. 2006) ("Generally, when an ALJ fails adequately to develop the record, we remand for further proceedings."); S.S.R. 16-3P, 2016 WL 1119029, at *4 (Mar. 16, 2016) ("We will not evaluate an individual's symptoms without making every reasonable effort to obtain a complete medical history unless the evidence supports a finding that the individual is disabled." (footnote omitted)).

---

[10] All of these errors also contributed to the ALJ's unjustified rejection of Dr. Reilly's opinion regarding the longstanding nature of Plaintiff's disabling condition. Thus, on remand, the ALJ should, *inter alia*, re-evaluate Dr. Reilly's medical opinions consistent with this Order.

## CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this Order. The Clerk of Court is respectfully requested to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*

Pamela K. Chen
United States District Judge

Dated: Brooklyn, New York
      September 28, 2017